```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
DAVID HIMBER,
Individually and on behalf of a class,

                    Plaintiff,      MEMORANDUM & ORDER
                                    16-CV-5001(JS)(GRB)
        -against-

LIVE NATION WORLDWIDE, INC., and
LIVE NATION MARKETING, INC.,

                    Defendants.
----------------------------------X
APPEARANCES
For Plaintiff:      Tiffany N. Hardy, Esq.
                    Dan Edelman, Esq.
                    Edelman, Combs, Latturner & Goodwin LLC
                    20 S. Clark Street 1500
                    Chicago, IL 60603

                    Abraham Kleinman, Esq.
                    Kleinman, LLC
                    626 RXR Plaza
                    Uniondale, NY 11556-0626

For Defendants:     Lawrence E. Buterman, Esq.
                    Latham & Watkins LLP
                    885 Third Avenue
                    New York, NY 10022-4834

                    Daniel M. Wall, Esq.
                    Latham & Watkins LLP
                    505 Montgomery Street
                    San Francisco, CA 94111
```

SEYBERT, District Judge:

Plaintiff David Himber ("Himber") brings this putative class action against defendants Live Nation Worldwide, Inc. and Live Nation Marketing, Inc. (collectively, "Live Nation") for alleged violations of New York General Business Law ("GBL") §§ 349 and 350.  Live Nation moves to compel arbitration and stay this

action pending arbitration.  Himber opposes the motion.  For the reasons below, the motion is GRANTED.[1]

BACKGROUND

I. Procedural History

In response to the Complaint, Live Nation moved to dismiss.  (See Mot. To Dismiss, Docket Entry 21.)  That motion was denied.  (See July 6, 2017 Minute Order, Docket Entry 27.)  Thereafter, Live Nation answered the Complaint, asserting as an affirmative defense that Himber's claims are subject to mandatory binding arbitration and a class-action waiver.  (Ans., Docket Entry 28, ¶ 53.)  Live Nation again moves to compel arbitration, claiming the parties have an enforceable agreement to arbitrate.  (See Mot. to Compel, Docket Entry 62.)

II. Factual Background

For purposes of this decision, the background can be summarized as follows.  Live Nation operates a website through which customers can purchase online tickets for performances at various entertainment venues, including the Nikon at Jones Beach Theatre at Jones Beach State Park—which Live Nation is licensed to operate. (Compl. ¶¶ 7, 11.)  During the past several years, Himber has used Live Nation's website to buy event tickets online.

---

[1] Although Live Nation requests oral argument (see Feb. 13, 2018 Letter/Mot., Docket Entry 68), the Court finds that oral argument is not necessary to its determination.  The Clerk of the Court is directed to terminate this motion as DENIED.

(Declaration of Kimberly Tobias "Tobias Decl.", Docket Entry 64, ¶ 5.) Himber's claims arise from his use of the website in June 2016. At that time, Himber entered the website, navigated to the page for a September 1, 2016 Rascal Flatts concert at Jones Beach Theatre, and browsed for tickets. (Compl. ¶¶ 10-11.) He saw that the tickets he sought were $49.50 each, but that there was a $15.25 online-service fee added to the price of each ticket. (Compl. ¶ 11.) After learning of this online-service fee, Himber decided to go to the box office, which was 20 minutes away, to buy the tickets and avoid the fee. (Compl. ¶ 12.) However, when Himber purchased the tickets at the box office, he was charged an additional $6 per ticket, a charge that was not disclosed on Live Nation's website—but which he paid, having "already incurred the time and expense of visiting the box office and there was no cheaper alternative." (Compl. ¶¶ 13-16.) Himber maintains that it is impossible to avoid the $6 charge at the box office, making the true price of a ticket $55.50—not $49.50. (Compl. ¶ 17.) He claims that Live Nation's policy and practice of advertising one price for a ticket on the website (here, $49.50), and then charging a higher price to people arriving at the box office (here, $55.50) constitutes false advertising and a deceptive practice in violation of GBL §§ 349 and 350. (Compl. ¶¶ 18-20, 31, 35.)

In support of its motion, Live Nation submits a declaration of Kimberly Tobias, Live Nation's Vice President, Legal

Affairs. (Tobias Decl. ¶ 2.) Tobias represents that Live Nation operates the website at issue, livenation.com, and maintains records of customers' online ticket purchases. (Tobias Decl. ¶¶ 3-4.) She explains the process of using Live Nation's website, completing the required forms, registering an account, and making online ticket purchases. (Tobias Decl. ¶¶ 4, 8.) She attaches to her declaration various screen shots showing a homepage, forms customers are required to complete, and the "Terms of Use" to which they must agree before making those purchases. (See Tobias Decl. ¶ 4 and Exs. 1-8, Docket Entries 64-1 - 64-8.) Tobias maintains that Live Nation's records show that Himber made six purchases on Live Nation's website from 2009 to 2016, the most recent on June 3, 2016, when Himber purchased tickets to a Beach Boys concert at the Ford Amphitheater at the Coney Island Boardwalk. (Tobias Decl. ¶ 5.)

Tobias explains that users who visit the website typically first visit the website's homepage, then they navigate through a series of webpages to buy tickets. (Tobias Decl. ¶ 6.) In doing so, users navigate through those pages by clicking on designated hypertext "links" found on each page. (Tobias Decl. ¶ 6.) The homepage and virtually all interior pages of the website state that use of the site is subject to the Terms of Use, with each page advising users that they agree to abide by those terms if they continue past the page and use the site, and with each page

providing a hyperlink directly to the Terms of Use. (Tobias Decl. ¶¶ 6-7 & Ex. 1.) To buy tickets from the website, a customer, such as Himber, is required initially to register a Live Nation account. (Tobias Decl. ¶ 8.) Attached to Tobias' declaration are screen shots that are identical or materially similar (due to slight changes made over time) to the ones a customer would have seen as a homepage and during the registration and/or purchasing process. (Tobias Decl. ¶¶ 6-11 & Exs. 1-7.) During the registration process, a customer must click a "Sign Up" or "Accept and Continue" button to set up an account. (Tobias Decl. ¶ 8 & Ex. 2.) Directly above that button, the customer is informed that by using the website, the customer agrees to the Terms of Use, and the customer is presented a hyperlink to those Terms of Use. (Tobias Decl. ¶ 8 & Ex. 2.) After the initial sign up, when a customer uses the website to purchase tickets, the customer is required to click a "Sign In" button, which appears directly above a notice stating that "[b]y continuing past this page, you agree to our Terms of Use." (Tobias Decl. ¶ 9 & Ex. 3.) To complete each purchase, the customer clicks a "Place Order" button, while a notice immediately above the button informs the customer that "By clicking 'Place Order', you agree to our Terms of Use." (Tobias Decl. ¶ 10 & Ex. 4.) According to Tobias, it would have been impossible for Himber to purchase tickets on the website without first clicking the

"Place Order" button manifesting his assent to the Terms of Use. (Tobias Decl. ¶ 13.)

Tobias maintains that since June 14, 2011, Live Nation's "Terms of Use" have contained an arbitration provision. (Tobias Decl. ¶¶ 7, 11 & Exs. 5, 6, 7.) The arbitration provision in effect when Himber purchased Beach Boys tickets online on June 3, 2016 and when he accessed the website before purchasing Rascal Flatts tickets at the box office, provides: "Any dispute or claim relating in any way to your use of the Site, or to products or services sold or distributed by us or through us, will be resolved by binding arbitration rather than in court . . . ." (Tobias Decl. Ex. 7, at ECF p. 4.) The provision states that it is "governed by the Federal Arbitration Act." (Tobias Decl. Ex. 7, at ECF p. 4.) It also includes a waiver of the right to participate in a class action and states that the "arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement." (Tobias Decl. Ex. 7, at ECF pp. 4-5.) While the Terms of Use have been amended from time to time, they have always been broad in scope. In this respect, the arbitration provision in effect on June 17, 2011, the date Himber purchased Foo Fighter tickets, applies to "all disputes and claims between [Live Nation and its customers] . . . including, without

6

limitation, claims relating to . . . your use of Live Nation's website . . . [and] any statements or advertising on the Website[]." (Tobias Decl. Ex. 5, at ECF p. 6, ¶ 19.)

Tobias also notes that Live Nation's parent company, Live Nation Entertainment, Inc., also owns Ticketmaster L.L.C. ("Ticketmaster"), which operates a website, ticketmaster.com. (Tobias Decl. ¶ 3.) She maintains that Ticketmaster's website and Live Nations's website are "materially identical . . . , in that both websites perform similar functions, have similar designs, and contain identical Terms of Use and similar notices informing users that by using the website, creating an account, and purchasing tickets online they agree to be bound by those Terms of Use." (Tobias Decl. ¶ 12.)

DISCUSSION

I. Legal Standard

Courts review a motion to compel arbitration under a "'standard similar to that applicable for a motion for summary judgment.'" Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016) (quoting Bensadoun v. Tobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)). That standard "requires a court to 'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits.'" Id. (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir.

7

2002) (alteration in original)). "In doing so, the court must draw all reasonable inferences in favor of the non-moving party." Id.

The Federal Arbitration Act ("FAA") expresses the strong federal policy favoring arbitration. Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010); Zaken v. Jenny Craig, Inc., No. 11-CV-2465, 2011 WL 4916928, at *1 (E.D.N.Y. Oct. 13, 2011); see also Washington v. William Morris Endeavor Entm't, LLC, No. 10-CV-9647, 2011 WL 3251504, at *10 (S.D.N.Y. July 20, 2011) (staying a lawsuit that alleged, among other things, employment discrimination). The FAA provides that arbitration agreements are "valid, irrevocable and enforceable," unless such grounds exist for the revocation of the contract. 9 U.S.C. § 2; see also Ragone, 595 F.3d at 121 (quoting 9 U.S.C. § 2). In keeping with this policy, a court resolves doubts in favor of arbitration and enforces privately-negotiated arbitration agreements in accordance with their terms. Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 19-20 (2d Cir. 1995).

II. Agreement and Scope of Agreement

In determining whether to compel arbitration, a court must determine (1) whether such agreement exists between the parties, as determined by state contract law; and, if so, (2) whether the dispute falls within the scope of that agreement. Meyer v. Uber Techs., Inc., 868 F.3d 66, 73-74 (2d Cir. 2017); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016);

8

Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 26 (2d Cir. 2002); Infinity Indus., Inc. v. Rexall Sundown, Inc., 71 F. Supp. 2d 168, 170 (E.D.N.Y. 1999).

As for whether an agreement to arbitrate exists here, the parties do not dispute that ordinary principles of contract formation and construction control. See Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 296-97 (2010). To form a contract, there must be mutual manifestation of assent by the parties, whether by words or conduct, sufficient to assure that they are truly in agreement with respect to all material terms. Specht, 306 F.3d at 29; Friedman v. Schwartz, No. 08-CV-2801 (JS) (WDW), 2009 WL 701111, at *9 (E.D.N.Y. Mar. 13, 2009). "[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance." Hines v. Overstock.com, Inc., 380 F. App'x 22, 25 (2d Cir. 2010). In other words, "[w]here there is no evidence that the offeree had actual notice of the terms of the agreement, the offeree will still be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms," Meyer, 868 F.3d at 74-75, a determination turning on the "'[c]larity and conspicuousness of arbitration terms,'" Id., at 75 (quoting Specht, 306 F.3d at 30). When dealing with web-based contracts, as here,

9

"clarity and conspicuousness are a function of the design and content of the relevant interface." Id.

In Meyer, the Second Circuit observed that one way it has distinguished web-based contracts is the manner in which the user manifests assent. Id. In this respect, the court differentiated between "clickwrap" agreements, which require users to click an "I agree" box after being presented with a list of terms and conditions of use, and "browsewrap" agreements, which generally post terms and conditions on a website via a hyperlink at the bottom of the screen. Id. Because browsewrap agreements do not require the user to expressly assent, the validity of a browsewrap agreement depends on whether the user has actual or constructive knowledge of a website's terms and conditions. Id. On a motion to compel arbitration, a court "may determine that an agreement to arbitrate exists where the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." Id. at 76.

Himber does not dispute that before he used Live Nation's website on the day that he purchased Rascal Flatts tickets at the box office, he had used the website to purchase tickets, having previously registered an account thereon. Himber does not deny having actually seen or read the Terms of Use, including the arbitration provision, when he made earlier ticket purchases online. Nor does he sufficiently contest that the layout and

10

language of the website provided reasonably conspicuous inquiry notice of the arbitration provision when he used the website to purchase tickets. In fact, the evidence shows that the website's homepage page and interior pages contain reasonably conspicuous hyperlinks to, and notices concerning applicability of, the Terms of Use. By accessing the website and purchasing tickets thereon, Himber manifested assent to the Terms of Use, including the arbitration provision.

Nevertheless, the crux of Himber's argument is that the Terms of Use on the website do not govern his purchase of tickets at the box office. (See Plaintiff's Response to Defendants' Motion to Compel Arbitration, "Pl.'s Br.", Docket Entry 66, at 1 ("It is not 'reasonably conspicuous' to a reasonably prudent 'computer user' that the terms and conditions would govern a purchase at the box office"; and "Himber's prior use of the website would not convey to him that terms and conditions on the website that governed his purchase of tickets online would govern a later purchase at the box office"); Pl.'s Br. at 5 ("There is no basis for a claim that when [Himber} actually purchased his tickets at a box office, an arbitration clause was a term of the deal.").) Himber takes issue with the exhibits attached to the Tobias Declaration, arguing that "the performance pages are cluttered" and that the notice, "BY CONTINUING PAST THIS PAGE, YOU AGREE TO OUR TERMS OF USE," is not accessible without scrolling down. (Pl.'s

11

Br. at 5.)  He maintains that a "user who has only accessed the website to determine what shows or performances are available would have no reason to access exhibits 2-4"--interior webpages containing the hyperlink to the Terms of Use and/or notices regarding continuing further.  (Pl.'s Br. at 5.)  He further maintains that even if a consumer noticed the Terms of Use in exhibit 7, which he state are the relevant Terms of Use at issue on this motion, a reasonable consumer who was purchasing tickets at the box office "would conclude that nothing that follows [the first paragraph] applies and stop reading."  (Pl.'s Br. at 6.)  In this respect, the first paragraph provides:

> Welcome!  The following are the terms of use ("Terms") that govern your use of the Live Nation sites and applications where this appears (collectively, the "Site").   Our Privacy Policy, Purchase Policy, and any other policies, rules or guidelines that may be applicable to particular offers or features on the Site are also incorporated into these Terms. By visiting or  using the Site, you expressly agree to these Terms, as updated from  time to time.

(Tobias Decl. Ex.7, at ECF p. 2 (emphasis omitted).)  The arbitration provision, he notes, does not appears until ECF page 4 of Exhibit 7.

To the extent that Himber's argument challenges whether he assented to the Term of Use by using the website on the day in question, the Court concludes that he did.  When Himber used the website on the day he purchased the Rascal Flatts tickets, he again

manifested assent to be bound by the Terms of Use--a use that he specifically claims subjected him to Live Nation's false advertising and deceptive practices. Himber alleges that when he accessed the website that day, he was interested in purchasing three tickets to the Rascal Flatts concert. (Compl. ¶¶ 10-11.) By using the website that day, Himber would have clicked on multiple Live Nation webpages, including the homepage page and interior pages (Tobias Decl. ¶ 7 & Ex. 1), which contained the reasonably conspicuous hyperlinked Terms of Use and notices advising users that by continuing past that page, they agree to abide by the Terms of Use. See Meyer, 868 F.3d at 79 ("As long as the hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent . . . user would have constructive notice of the terms."). As a result, Himber was on inquiry notice of, and had manifested assent to, the Terms of Use, including the arbitration provision, whether or not he choose to read the accessible Terms of Use. See id. ("While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice."). Contrary to Himber's contentions, the website and its Terms of Use provide a reasonable user with reasonably conspicuous notice of the Terms of Use, whether or not the user ultimately purchases tickets on the website. See Id. at 79-80. Moreover, contrary to Himber's contentions, a user who actually notices the Terms of Use in Exhibit 7 would not be

13

reasonable in believing that provisions following the first paragraph apply only to users purchasing tickets online, not at the box office. Indeed, the first paragraph expressly advises that the "following" terms "govern your use of the [website]," unqualified by later language stating or reasonably suggesting that the terms apply only to users making online purchases--but not to a user complaining about false advertising and deceptive practices that affected a box office purchase. Accordingly, the Court concludes that the record demonstrates that the parties entered into an agreement to arbitrate.

To the extent that Himber argues that the dispute and his claims do not fall within the scope of the arbitration provision, the parties disagree whether that issue is to be determined by the Court or by an arbitrator. Live Nation argues that the issue must be determined by an arbitrator, whereas Himber argues that the determination is for the Court. (See Memorandum of Law in Support of Defendants' Motion to Compel Arbitration, at 11-2, Docket Entry 63; Pl.'s Br. at 13-14.)[2] The Court agrees with Live Nation that

---

[2] Himber also argues that Live Nation, by asking this Court to "enforce the website's terms-of-use" in its earlier motion to dismiss (see Memorandum of Law in Support of Defendants' Motion to Dismiss, Docket Entry 21-1, at 10-11), somehow "waived" the present argument that arbitrability must be determined by the arbitrator. (Pl.'s Br. at 14.) There is no basis for Himber's claim of waiver, as Live Nation made the same argument then as it makes now: it urges the Court to enforce the Terms of Use and send the case to arbitration for determination of arbitrable issues.

14

the Terms of Use set forth the parties' agreement that an arbitrator will determine whether this dispute is within the scope of the arbitration provision. In this respect, the parties agreed that "[t]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement. . . ." (Tobias Decl., Ex. 7, at ECF p. 4-5.) This express contractual provision clearly and unmistakably demonstrates the parties' intent to delegate the question of arbitrability to the arbitrator. See Mumin v. Uber Techs., Inc., 239 F. Supp. 3d 507, 522-23 (E.D.N.Y. 2017) (holding that similar language "clearly and unmistakably evinces the parties' intent to submit to an arbitrator any disputes relating to the interpretation or application of the arbitral clause"); see also Nevarez v. Forty Niners Football Co., LLC, No. 16-CV-7013, 2017 WL 3492110, at *10-11 (N.D. Cal. Aug. 15, 2017) (holding that similar language in Ticketmaster's terms of use "clearly and unmistakably delegates the question of arbitrability to the arbitrator").

Even if the Court were to agree with Himber that the determination of the scope of the arbitration provision is for this Court, the arbitration provision appears broad enough the cover the present dispute and claims. As noted, the arbitration provision covers: "Any dispute or claim relating in any way to your use of

15

the Site, or to products or services sold or distributed by us or through us, will be resolved by binding arbitration rather than in court . . . ." (Tobias Decl. Ex. 7, at ECF p. 4.) The current dispute and claims for false advertising and deceptive practices relate to Himber's <u>use</u> of Live Nation's website and to his <u>use</u> of the website in connection with his box-office purchase of tickets-- Live Nation's "products or services." Himber seemingly ignores that his claims in this action are for false advertising and deceptive practices arising from his <u>use</u> of Live Nation's website. Indeed, he claims that Live Nation's policy and practice of advertising one price for a ticket on the website (here, $49.50), and then charging a higher price to people arriving at the box office (here, $55.50) constitutes false advertising and a deceptive practice in violation of GBL §§ 349 and 350. (<u>See</u> Compl. ¶¶ 16, 20 ("Nothing on the web site disclosed that there was a charge of $6 for purchasing tickets at the box office. . . . The practice of advertising one price for a ticket and then charging a higher price when people arrive at the box office is deceptive and injurious.").) The legal and factual bases for his claims cannot be so easily divorced from his complaints about the website and his use thereof on the day in question. In other words, as Live Nation argues, "Himber cannot base a claim on his use of Live Nation's website and at the same time argue that his use of that website is irrelevant because he purchased his tickets at the box office."

16

(Reply Memorandum of Law in Further Support of Defendants' Motion to Compel Arbitration, "Defs.' Reply Br.", Docket Entry 67, at 5.)

III. Remaining Arguments

Himber also argues that Live Nation's motion is barred by judicial estoppel. (Pl.'s Br. at 11-12.) To invoke judicial estoppel, a party "must show that: (1) his adversary 'advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner.'" Wight v. BankAmerica Corp., 219 F.3d 79, 90 (2d Cir. 2000) (quoting AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc., 84 F.3d 622, 628 (2d Cir. 1996)). "'[T]here must be a true inconsistency between the statements in the two proceedings. If the statements can be reconciled there is no occasion to apply an estoppel.'" Id. (quoting Simon v. Safelite Glass Corp., 128 F.3d 68, 72-73 (2d Cir. 1997)) (alteration in original).

According to Himber, Live Nation is judicially estopped from taking the position it currently takes because Ticketmaster, its affiliate, took a contrary position in two earlier, unrelated cases. (See Pl.'s Br. at 11 (citing Goza v. Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty., No. 12-CV-6125, 2014 WL 3672128 (W.D. Ark. July 23, 2014), and Nevarez, 2017 WL 3492110).) In this respect, Himber claims that in Goza and Nevarez, Ticketmaster "asserted that it's [sic] arbitration clause was not unconscionable because a customer was free to buy tickets at a box

17

office without being bound by the arbitration clause." (Pl.'s Br. at 11.) Himber's reliance on judicial estoppel is misplaced. As stated above, the present dispute and claims are based on Himber's use of Live Nation's website--which he asserts subjected him to false advertising and deceptive practices under New York law. Even assuming that Live Nation is bound by the position Himber claims Ticketmaster took in Goza and Nevarez, Live Nation does not argue that the purchase of tickets from a Live Nation box office results in the purchaser's assent to the arbitration provision on its website. Rather, in Live Nation's words, its position here is that "one cannot use Live Nation's website, base a lawsuit on the use of that website, and then claim the Terms of Use on that website are inapplicable merely because the individual made a subsequent purchase at Live Nation's box office." (Defs.' Reply Br. at 5-6 (emphasis omitted).) Accordingly, there is no true inconsistency to support the application of judicial estoppel.

Himber further argues that any agreement to arbitrate was induced by misrepresentation. (Pl.'s Br. at 14.) This argument is baseless, as Himber provides no support or sufficient explanation for this contention.

## CONCLUSION

For the above reasons, the Court GRANTS Live Nation's motion to compel individual arbitration and to stay the action pending arbitration.

18

The Clerk of the Court is directed to mark the November 28, 2017 Consent Motion, (Docket Entry 58), as MOOT and the February 13, 2018 Letter/Motion, (Docket Entry 68), see supra n.1), as DENIED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:   May __21__, 2018
         Central Islip, New York